Good morning, and may it please the Court. My name is Deborah Edmondson, and I'm here representing James Hawthorne, the plaintiff, this morning, and I thank the Court for this opportunity. The two issues I'm going to be focusing on this morning are as follows. James Hawthorne established a prima facie case for retaliation against Birdville ISD, and Shelley Freeman was a nearly identical comparator. James Hawthorne, a white male, believed that he was being underpaid for someone in his supervisory position with his 13 years experience working at Birdville ISD. His position was Warehouse Central Storage Supervisor, and he worked directly with Shelley Freeman, who was the Director of Purchasing for the school district. Both of these individuals worked under Katie Bowman, who was the Associate Superintendent for Finance and Resiliary Services. Now, Mr. Hawthorne was located, his position was at the M-8 step, and he was being paid at the bottom of the step within the school district. He was being paid as if he had three to four years experience, other than the 13 years he had. The midpoint of that step was a $252 per deem, per day rate, and he was being paid at $212 in 2018 and 2019, and then in 2019, that was to 2020, it was increased to $219 per deem. Now, Katie Bowman was the ultimate decision maker regarding Mr. Hawthorne's salary and his position in the district. Now, during the course of his 13 years at Birdville ISD, Mr. Bowman always received positive job reviews, he was never written up, and in fact, three different times in the course of his employment, he received what's called a class award in 2013, 2018, and 2021, and this award was for making a difference in the lives of others, specifically. Now, in 2018, he applied to coach the girls JV basketball team, which would have been extra responsibilities and extra money. However, he was turned down for this position based on a denial from Ms. Bowman, and Shelly Freeman testified in her deposition that she was not the person who made this decision. The appellee's brief states that Ms. Bowman said she denied the job to Mr. Hawthorne because, one, he wasn't qualified, although I don't know how she would know that, and two, the fact that it would interfere with his job responsibilities. Ultimately, a woman was hired for that position, and then in 2019, Mr. Hawthorne applied for the director of transportation position, and this also would have been reporting to Ms. Bowman. He submitted nine letters of recommendation, and again, Ms. Bowman hired a woman for that position. Fast forward to July 12th, 2021, Mr. Hawthorne received an email from Mark Chapa, who was the HR coordinator for the school district, and was told that his salary was being increased to $254 per dean. The school board had recently voted to give an across-the-board increase to all the employees, and there had been also a third-party company who did further research into it, and that he could look forward to that increase being in his next paycheck, which the school district employees are paid once a month. Checks generally, or the money is generally placed in their accounts between, like, the 23rd and 25th of the month, but when Mr. Hawthorne got his July 23rd check, it wasn't, there was not, that raise was not there. Now, right around this time in July, toward the end of the month, Mr. Hawthorne got sick with COVID, and he did not return to work until August 2nd, but the first day that he did, he emailed Mark Chapa about, where's my raise, why didn't I get the raise? He did not respond. So, on August 6th, Mr. Hawthorne forwarded the July email from Chapa to Ms. Bowman. Ms. Bowman, according to the record, forwarded it to Paige Currie, and Paige Currie is the director of HR for the school district, and in the email, which is in the record, Ms. Currie responds to Bowman that she has addressed this, quote, error in communication, unquote, with Chapa, and then Currie follows up to say she is going to send an email using Katie's name, but ultimately, Katie Bowman emailed Hawthorne on August 9, 2021, that he was not getting this raise, but instead a raise to $239 per dean. She did not offer an explanation. Now, Apelli's brief claims that it was based on guidance from HR, but in fact, HR does not make those decisions. HR implements these kind of decisions. Plus, Mr. Hawthorne was told the original increase to $254 came directly from Mark Chapa of HR. He didn't hear anything further about it until he was called to a meeting on August 17th with Katie Bowman and Paige Currie. He assumed the purpose of the meeting was to discuss the salary issue, but instead, he was blindsided and told he was going to be named Jordan Bryan. Now, according to the Apelli's brief, Ms. Bryan complained not only of alleged sexual harassment, but Ms. Bryan, who worked under Mr. Hawthorne, complained about Mr. Hawthorne's job performance, flaws in his supervisory abilities, and his general incompetence. Now, it's pretty unlikely for an administrative assistant to be able to make those claims about her boss, especially to the associate superintendent. However, during the August 17th meeting, Hawthorne was not questioned about the allegations. He was told, turn in your keys, don't make any contact with anyone. There was a telephonic interview on September 1, so that's approximately two days later, I was on a phone call where I was finally asked about these allegations. He denied all of them and then was eventually allowed to return to work. However, six weeks later, on October 8th, Bowman was presented, I'm sorry, Mr. Hawthorne was presented with his first ever write-up from Katie Bowman. Now, the write-up itself contained no specific instances of improper behavior, but instead focused on generalities. When I asked Ms. Bowman about this in her deposition, she could not give me any specific instances relating to Hawthorne, but instead said it was just a culture of unpleasantness. Bowman also stated in her deposition that she believed she interviewed approximately nine people, although the appellee's brief takes the position that she interviewed no one. Bowman stated in the write-up she was also demoting Hawthorne to a non-supervisory position that also came with a lower pay rate. So, in conclusion, Ms. Bowman's fingerprints are all over Hawthorne's failure to advance monetarily. Not only did she pass him over for promotion, she even refused to allow him, she refused to approve any extracurricular work for him to earn more money. When the salary issue came up, in between late July and early August, Mark Chapa, and he was an HR person, likely passing on information he was given, it created a new issue. And suddenly, at the same time, a complaint came forward from Jordan Bryan. Now, according to Jordan Bryan in her deposition, how it came about was she registered a complaint about cameras that were in her office to Shelly Freeman and then made casual comment about Mr. Hawthorne's comings and goings. And that changed into Bowman and Freeman asking her to write down her concerns, which led to Mr. Hawthorne being placed on paid leave and ultimately demoted by Bowman. The second issue I wanted to discuss was the issue of Shelly Freeman as a nearly identical comparator. Around that same time of the salary issue, July 2021, the assistant director of purchasing, Marina Williams, submitted a complaint to HR, along with her letter of resignation, complaining of unprofessional behavior and lack of support she had received from her supervisor, Shelly Freeman. According to Williams' complaint, Freeman told other members of her team she thought Mr. Hawthorne was stupid, a bad manager, and she wanted to get rid of him. Williams also stated in her resignation that Freeman asked her team members for any possible reasons she could use and give to Bowman to write up Mr. Hawthorne. Williams complained to Ms. Bowman about Freeman while employed, but Bowman never asked Williams to write down her concerns, and nothing changed with Freeman. Ms. Edmondson, with regard to the retaliation claim, can you tell me specifically what protected activity or how Mr. Hawthorne participated in protected activity and when? Yes, Your Honor. The protected activity that Mr. Hawthorne participated in was his questioning of his salary, which that he did a number of times prior to Mark Chapa talking to him. And even when he found out the lower rate, he was questioning this. And the EEOC, in listing the guidelines relating to this type of thing, specifically lists the questioning of salary potentially based on discriminatory practices as a protected activity. Did your client ever say, when questioning his salary, did he make any statements with regard to his belief that he was being paid less than other employees who were female? I think in his emails, they were pretty straightforward. He would say, why am I being paid at this rate? What is my salary going to be? So he did not make those statements at that time. But he did make the statements subsequent to that. Did he make the statements subsequent to any adverse action or before? Subsequent to, yes, the adverse action. And what, does he contend, was the adverse action? Well, the adverse action was, I mean, it's, the adverse action was the lower salary, then what came about virtually at the same time was this complaint manifested by Ms. Bryan and then Ms. Bowman following it up with, writing him up and demoting him. Okay. Anything else you want to tell us? Well, I was going to quickly get into the issue of Shelly Freeman being a nearly identical comparator. Right, you mentioned that, but that's in your brief, of course. It is? Did you not want me to discuss? No, you can go ahead, but I'm more aware of the fact that- Well, I was going to point out, by comparison, so I talked about the assistant director of purchasing, Marina Williams, complained about Shelly Freeman, and what happened was the way Bowman handled the investigation of Freeman was very different from how she handled the investigation of Hawthorne. She did not put Freeman on leave while she was investigating Williams' complaints. She only interviewed two other females, and she testified in her deposition, she ultimately did nothing with Williams' complaint because Freeman denied everything, and Ms. Bowman testified that it was Williams' word against Freeman. And then I do go into Freeman as a nearly identical comparator from Mr. Hoffman, because Katie Bowman was the ultimate decision maker in both the Hawthorne and Freeman investigation. They both held supervisory positions, and they managed a staff, and their responsibilities were very similar. Further, Ms. Bowman conducted both of the investigations into the allegations, and she was the ultimate decision maker regarding both of their statuses. Okay. You have reserved time for rebuttal. Thank you, Your Honors. Now, we'll hear from Meredith Walker for the school district. May it please the Court. My name is Meredith Walker, and I'm here on behalf of Applee-Birdville Independent School District. Before addressing the issues that counsel addressed, I wanted to note that the procedural issue that the district raised in its opening, in its Applee brief about the failure to cite, when opposing counsel and Mr. Hawthorne filed their reply brief, they did put in citations, but if the panel compares the opening brief with the reply brief, you will find they are almost identical, with the exception of two added paragraphs on pages 13 and 14. In other words, Mr. Hawthorne didn't respond to a single argument that the district made in its Applee brief. With respect to the prima facie case of retaliation, Judge Ramirez hit the nail on the head. The issue is whether Mr. Hawthorne engaged in a protected activity in the first instance, and he did not. As the Court is well aware what a protected activity is, and while questioning your salary from a standpoint of discrimination can, in fact, be a protected activity, that is not what occurred here. When the panel looks at the record, it's at Record on Appeal at page 224, the email that Mr. Hawthorne sent said, please review and let me know my $248 salary for the 2021-2022 school year. That does not place a single reasonable person on notice that Mr. Hawthorne is questioning his salary from a discriminatory standpoint. In fact, when asked about it during his deposition, he said, I was asking about where I was in the box as far as experience in doing a position. I then asked him, and was your concern that you were not being paid the same as other individuals at your same level? And he said, yes. This is not a protected activity, particularly if the panel compares it to your decision in Muslow, which we've cited in the brief, where that individual did, in fact, engage in a protected activity by questioning her salary, giving examples of her move to a new position, and how with that move, her salary was going to be lagging behind the men who were similarly situated to her. There was no protected activity here. There's also no causal connection, which is one of the other elements they have to bring forth. On July 30th, Mr. Hawthorne sent the email that I referenced earlier asking about his  On July 12th, Mr. Chapa went ahead and gave him his new salary, albeit the incorrect salary. On July 23rd, Birdville ISD paid Mr. Hawthorne the correct salary. On August 5th, the Administrative Assistant Brian, Ms. Brian, reported concerns regarding Hawthorne. It wasn't until the next day on August 6th that Mr. Hawthorne brought his concerns to Katie Bowman, and while I realize all of this happened within about a six-week period, Ms. Bowman did not know about Mr. Hawthorne's alleged concerns regarding his salary until after Ms. Brian had reported him. So from the prima facie case standpoint, Mr. Hawthorne just cannot get there. But even if we move to pretext, what has not been addressed in the district court, in the opening brief, in the reply brief, is but-for causation. But-for causation is absolutely required in a retaliation case to prove pretext. And plaintiff, Mr. Hawthorne, sorry, pled himself out of a claim in his opening brief and repeated it in his reply brief when he said, the difference in Associate Superintendent Bowman's handling of these investigations is stark, and the clearest reason for this difference is that Mr. Hawthorne is a male and Purchasing Director Freeman is a female. That is not but-for cause. He says that the protected activity he engaged in was sending an email about his salary. And then he pleads that the reason he was treated differently was because of his sex, not because he engaged in a protected activity. But the court does not have a sex discrimination claim in front of it. The court has a retaliation claim in front of it. And so the court just cannot get there, even assuming he engaged in a protected activity. Then, from the standpoint of whether Ms. Freeman was a proper comparator, they fail at every single step. They did not hold the same job responsibilities. And counsel said, well, they were both supervisors. If being a supervisor was enough to be a proper comparator, everybody would be a proper comparator. The court's decision in Lyon does not support such a broad reading of that. Counsel, if we don't, if we only have a retaliation claim and not a gender discrimination claim, why do we need a comparator? That's how, I don't think that you do, that's how opposing counsel is attempting to prove pretext is by using the comparator analysis. And that's why I am addressing it. Because she is saying that there's a proper comparator. And, but again, to your point, Judge Ramirez, that's not even the test. The test is, was it but-for causation? And she can't show the but-for causation. And Mr. Hawthorne cannot get past the pretext stage. But even if the court looks at that, they fail at every one. And there's testimony in the record regarding their job responsibilities. And at record on Appeal 213, Mr. Hawthorne said his duties were to make sure that all things were delivered, that were ordered from the campus level to campuses for staff, and then to replenish the warehouse inventory and work order system. Ms. Freeman testified at the record on Appeal at 316, that as the Director of Purchasing, she oversaw purchasing and warehouse activities to ensure compliance with applicable state and federal laws and regulations. And not to be too simplistic here, but Ms. Freeman was in charge of ordering what the district needed, and Mr. Hawthorne was the one who delivered what Ms. Freeman ordered. She complied with the laws, she made the orders, he was in charge of delivering it from the warehouse. Those are not similar job responsibilities. So Ms. Freeman also was Mr. Hawthorne's supervisor. So we fail on all of those tests, and then the court looks out whether they were accused of engaging in similar conduct. And it fails that test as well, because Ms. Bryan accused Mr. Hawthorne of sexual harassment, whereas Ms. Williams asserted claims against Ms. Freeman ranging from needing additional support, to Purchasing Director Freeman speaking poorly about Hawthorne and others. And as the court knows, when a school district, or any employer for that matter, when it's a claim for sexual harassment, it has to take that claim seriously, and it placed Mr. Hawthorne on leave accordingly so it could investigate that claim, and so they could make a determination as to whether it was borne out. So they don't have the same job responsibilities. They don't have the same supervisors. They're not nearly identical. And then the evidence in the record also shows at 311 to 312 that the Executive Director of Human Resources was actually the ultimate decision maker. She directed the coordinator, Chapa, to investigate. She directed Ms. Bowman to have Ms. Bryan reduce her concerns to writing. She decided to place Hawthorne on leave. She decided to reassign and reprimand Hawthorne. So a different individual was making those decisions. But again, I don't think the court ever even reaches that analysis because Mr. Hawthorne cannot get past a prima facie case because he never engaged in that protected activity. And then finally, I want, even though counsel didn't address the hostile work environment claim, I did want to know that they also pleaded themselves out of a hostile work environment claim. In their opening brief at page 30 and in their reply at page 19, they say the exact same thing, which was it was the combined behavior of Bowman and Freeman that created the hostile work environment for Mr. Hawthorne, not just Freeman's gratuitous oversharing. They're claiming that Ms. Freeman created the hostile work environment, but in that paragraph right there, conceded that her conduct alone doesn't get them there. And it doesn't because she was a gratuitous oversharer and she did not discriminate against who she overshared. Ms. Williams and Mr. Hawthorne both testified and put evidence in the record that she overshared with whoever was around. So it wasn't necessarily being directed at Mr. Hawthorne because of his sex, which is what's required for a hostile work environment. It was being directed at whoever was around. And when the court also looks at the conduct, it just wasn't severe. Ms. Freeman didn't make any decisions, even if she was oversharing about her sex life. She wasn't making any decisions about Mr. Hawthorne's employment. And she wasn't part of his demotion. She didn't direct Mr. Hawthorne. And she was telling everybody that. She was telling everybody that. Not just men, but also women. Correct. And that is very clear in the record. It was, that was what was told to the EEOC. There's correspondence from counsel in the record saying that he was... She was not criticizing his sex. She was criticizing her own. She was criticizing her husband. Well, sexual interaction. Correct. It was directed at whoever was around. And that's not a hostile work environment based on sex, particularly when they're trying to get there by adding in Ms. Bowman's conduct. But we're not even sure what Ms. Bowman allegedly did. And just as one final note, counsel addressed Mr. Hawthorne's prior job opportunities. I would just like to note that while Mr. Hawthorne believes that nine letters of recommendation should have gotten him that job, the person that was hired was the assistant director of transportation who had been with Birdville ISD for 20 years. That's not a reasonable belief. That's an absurd belief. And there's also no record in the evidence as to... Or I'm sorry, no evidence in the record as to who received the basketball job. We don't know if it was a male or is a female. But regardless, all of that happened well before the incidents here. And they just can't be used to show the prima facie case. If you don't have any questions, I will rest on my brief and the arguments I made today. Okay. Thank you. Thank you. We'll hear the rebuttal. The appellee claims that there's no causal connection between the salary and that Mr. Hawthorne wasn't engaged in a protected activity. I mean, it's all connected. He had questions about his salary. He was told on July 12th he was getting an increase. On July 23rd, he did not get it. On August 2nd, when he came back from work, he immediately... Or came back from being sick with COVID, he immediately asked Mark Chapa about it who... Mark Chapa may have forwarded that email to Ms. Bowman. He then, when he didn't get a response from Chapa, he emailed Ms. Bowman on August 6th. On August 5th, Jordan Bryan went to Shelly Freeman with a complaint about a camera, which somehow morphed into a sexual harassment complaint against Mr. Hawthorne. Also, I want to point out, counsel initially said that there was no claim of sex discrimination. There's hostile work environment based on sex. That is one of our claims. And the fact that Ms. Freeman overshared with everyone is not relevant. It was offensive to my client. My client can't speak... Mr. Hawthorne can't speak to whether or not it was offensive to anyone else, but it was offensive to him. And she did ask my client about... That doesn't make it based on sex. Yes, yes. Hostile work environment based on sex. Right, but that... Her saying something he doesn't like is not enough. Well, she was also asking him about his sex life and asking him to talk about what his sex life was like. Okay. What's your best case for what Ms. Freeman did was sufficiently severe or pervasive enough for purposes of a hostile work environment case? Yes, we believe it was, Your Honor. What's your best case to support your contention... Oh, I'm sorry, I'm here hearing aids, so I'm... The case we had on that was... I'm sorry, I didn't write that case down, but it's in the brief. Lee v. Kansas City, I think. Thank you. Okay, you're done? Okay. Thank you both. We appreciate your argument. The case is under submission now. And we have concluded this panel's oral arguments for this week. Thank you all very much, and we are adjourned.